2016 IL App (2d) 151136
No. 2-15-1136
Opinion filed March 16, 2016

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* TATE OLIVER B., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Ogle County. |
| | ) | |
| | ) | No. 14-F-85 |
| | ) | |
| | ) | Honorable |
| (Evan M. W., Petitioner-Appellee, v. | ) | Kathleen O. Kauffmann, |
| Emily B., Respondent-Appellant). | ) | Judge, Presiding. |

PRESIDING JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices Zenoff and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1    The respondent, Emily B., appeals from the judgment of the circuit court of Ogle County finding that the petitioner, Evan W., is the father of her child, Tate Oliver B., and making various provisions involving legal custody, visitation, Tate's surname, child support, and the repayment of medical expenses.  We affirm in part, reverse in part, and remand.

¶ 2                                I. BACKGROUND

¶ 3    Tate was born on August 19, 2014, when Emily and Evan were both 18 years old.  The parties, who never married or lived together, continued to reside with their own parents.

¶ 4    By the time of Tate's birth, Emily and Evan were no longer in a dating relationship. Evan was listed on the birth certificate as Tate's father.  Emily gave Tate her own last name.

¶ 5    In November 2014, a little less than three months after Tate's birth, Evan filed a petition to establish parentage.  In it, he stated that he was the biological father of Tate.  (This fact is not contested.)  He sought a finding of parentage, the appointment of a guardian *ad litem* for Tate, and custody.  Emily filed a response admitting that Evan was Tate's father but denying that Evan was a fit and proper person to have custody of Tate.  She sought sole legal custody, and she also requested child support and the payment of medical expenses related to her pregnancy and Tate's birth.

¶ 6    Shortly after filing his petition to establish parentage, Evan moved for the entry of a temporary visitation schedule that would include upcoming holidays.  On November 26, 2014, the trial court entered an agreed order setting a temporary visitation schedule, allowing Evan visits of about two hours at his home on various days.  Another agreed temporary visitation schedule was entered on December 10, 2014, under which Evan had visits at his home of two hours or less, three times per week, and a four-hour visit on alternate Saturday mornings when Emily worked.  Evan was to "make an effort" to have his mother or another agreed-upon adult present during visits.  Emily was to provide all of the transportation for the visits.

¶ 7    On January 14, 2015, the trial court held a further hearing on the issue of visitation. During the hearing, Evan testified that he worked three nights per week for Vince's Pizzeria, delivering pizzas.  Emily testified that she was still nursing Tate and that breast milk was his only sustenance, as he had reflux and had not been able to eat solid food yet.  Tate needed to feed about every two hours, which limited the amount of time he could be away from her.  When Evan had his four-hour visit, Emily provided him with a bottle of breast milk to feed Tate and then fed Tate again as soon as she picked him up.  Emily worked at a bank and the visitation schedule was designed to accommodate both parties' work hours.  Both parties testified that,

when problems arose with the visitation schedule, they had been able to cooperate to resolve the problems. At the close of the hearing, the trial court modified the previous visitation schedule to extend Evan's visits to five hours on Mondays and Wednesdays (there was no change in the Saturday schedule). Evan was no longer required to have another adult present during his visits. Further, Emily was ordered to list Evan as Tate's father on documents such as medical records and child care forms.

¶ 8    On March 12, 2015, the parties appeared before the trial court on a motion to substitute Emily's attorney. While before the court, Emily drew the court's attention to her motion for temporary child support, which had been served upon opposing counsel but had not been filed with the court. Evan objected to the motion being heard and asked for time to file a response. After some discussion, during which the court admonished Emily's counsel that it required all motions to be properly filed and noticed up, the parties agreed to the entry of an order requiring Evan to pay Emily $40 per week in child support. This amount was based on the amount that Evan had paid Emily in the past voluntarily.

¶ 9    On March 31, Emily filed motions to: modify visitation; require Evan to search for full-time work and report his progress to the court; set permanent child support and require Evan to contribute toward Emily's pregnancy-related medical expenses; and award her interim attorney fees. On April 22, Evan filed responses to Emily's motions along with a motion of his own, in which he sought to have Tate's surname changed from Emily's surname to Evan's. Emily filed a response objecting to this motion. On May 13, the trial court entered an order modifying visitation to allow Evan three-hour afternoon visits on Tuesdays, Thursdays, Saturdays, and alternate Sundays.

¶ 10    On July 13, 2015, the trial court held a hearing on Evan's petition and all of the pending motions. Emily, Evan, and Evan's mother testified. The testimony given and the exhibits admitted are summarized below, as relevant to the various arguments raised on appeal. At the close of evidence, the court outlined the "highlights" of its rulings on various issues. As to custody, the court found, based upon the evidence and its observation of the parties, that the parties were able to cooperate to raise their child and that joint legal custody was in Tate's best interest. Emily was to remain the residential parent. As to Tate's surname, the court found that it would promote Tate's connection to both parents' families and communities to carry both parents' surnames. The court specified that Evan's surname would be added to the end of Tate's name so that his full name would be Tate Oliver B. W. Thus, Tate would have Evan's surname, while Emily's surname would become a second middle name for Tate.

¶ 11    On July 22, 2015, the trial court issued a nine-page order. The order recorded the court's previous verbal rulings regarding custody and Tate's surname. The order further placed conditions on Emily and Evan, which the court described as similar to those found in "a standard joint parenting order," requiring each of them to preserve Tate's relationship with the other parent and to share all information about Tate's health and education. In the event of conflicts, the parties were to attend mediation before returning to court. The order also set a visitation schedule that divided the holidays evenly between the parties and provided Evan with parenting time from morning to late afternoon on every Monday and Wednesday, and Saturdays and Sundays of alternate weekends. Overnight visitation would commence when Tate was 15 months old, with the addition of Saturday nights on Evan's weekends. Overnight visits on Friday nights on Evan's weekends would be added six months later. As to child support, the trial court continued Evan's previously agreed obligation of $40 per week, stating that this amount

was 20% of his net income. The trial court ordered Evan to pay one-half of Emily's medical expenses ($932.85), but allowed him to pay that sum over time at the rate of $5 per week. As to attorney fees, the parties were to bear their own costs.

¶ 12    Emily moved for reconsideration. When her motion was denied, she filed this appeal.

¶ 13                              II. ANALYSIS

¶ 14    On appeal, Emily challenges five aspects of the trial court's order of July 22, 2015: the imposition of joint legal custody; certain portions of the visitation schedule; the imposition of Evan's surname as Tate's surname; the amount of child support; and the rate at which Evan was required to reimburse Emily for her medical expenses.

¶ 15                         A. Joint Legal Custody

¶ 16    We begin with the issue of joint legal custody. Under section 602.1(b)[1] of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act), a trial court must consider whether

---

[1] Section 602.1 of the Marriage Act was repealed by Public Act 99-90, which replaced that provision (and section 602 (750 ILCS 5/602 (West 2014))) with a new provision, section 602.5 (Pub. Act 99-90, § 5-20 (eff. Jan. 1, 2016) (adding 750 ILCS 5/602.5)). That law took effect on January 1, 2016, after this appeal was filed, but before either party had filed a brief. The parties thus had the opportunity to brief the scope of the new law and its application to the issues raised on appeal. However, neither party briefed (or even mentioned) the new law, and their arguments are framed solely in terms of the law that was in effect at the time of the trial court's ruling. In the absence of any briefing on the application of the new law, and given that our own review suggests that the new law similarly permits the trial court to consider joint parental decision-making where the parties have not reached agreement on the issue (see *id*.), we, like the parties, cite the old version of the law herein.

joint legal custody is in the best interest of the child, even if the parties have not requested it. 750 ILCS 5/602.1(b) (West 2014) ("Upon the application of either or both parents, or upon its own motion, the court shall consider an award of joint custody."); see also 750 ILCS 45/14 (West 2014)[2] (all matters pertaining to the custody, visitation, and support of a child of unmarried parents must be determined using the same standards applicable under the Marriage Act). If it is in the best interest of the child, a trial court may order joint legal custody where it finds that the parents are able "to cooperate effectively and consistently in matters that directly affect the joint parenting of the child." 750 ILCS 5/602.1(c)(1) (West 2014). A trial court's determination regarding custody is given great deference because that court is in a superior position to judge the credibility of the witnesses and determine the best interests of the child. *In re Marriage of Lonvik*, 2013 IL App (2d) 120865, ¶ 33. "A trial court's determination as to the best interests of the child will not be reversed on appeal unless it is clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred. [Citation.] A judgment is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent." *In re Parentage of J.W.*, 2013 IL 114817, ¶ 55.

---

[2] The Illinois Parentage Act of 1984 cited here was also repealed (in its entirety) by the 2015 enactment of Public Act 99-85, which replaced it with a new statute. Pub. Act 99-85 (eff. Jan. 1, 2016) (adding 750 ILCS 46/101 *et seq.*). Neither party has sought to apply the new law on appeal and, as with the revisions to the Marriage Act, the new law appears similar in relevant respects. See, *e.g.*, Pub. Act 99-85 (eff. Jan. 1, 2016) (adding 750 ILCS 46/802(a)) (courts must determine custody, visitation, and support in parentage cases pursuant to the standards established in the Marriage Act). Accordingly, we, like the parties, cite the old version of the Parentage Act herein.

¶ 17    Emily argues that section 602.1(b) mandated that a trial court must first ask the parties to produce a joint parenting agreement and that it could not impose a joint parenting order unless they failed to produce such an agreement. See 750 ILCS 5/602.1(b) (West 2014) ("[T]he court shall initially request the parents to produce a Joint Parenting Agreement. *** In the event the parents fail to produce a Joint Parenting Agreement, the court may enter an appropriate Joint Parenting Order *** which shall specify and contain the same elements as a Joint Parenting Agreement ***.") It is true that the trial court does not appear to have specifically asked the parties to create a joint parenting agreement. However, the trial court did urge the parties to reach agreement on the issues wherever possible, and it sent the parties to mediation. Although the mediation initially went well, the parties ultimately were unable to reach agreement on any issue. Under these circumstances, the trial court was not required to make further efforts to have the parties reach an agreement regarding joint legal custody before ordering such custody. Moreover, once it found that joint custody would be in the best interest of the child, it was required to address the same issues typically resolved in a joint parenting agreement, such as parenting time, inclusion of both parents in school and medical records, and means of resolving disputes. See *id*.

¶ 18    Emily notes that Evan testified in a contradictory manner about whether he sought joint custody of Tate. At one point he did not appear to understand what joint custody was, stating that he simply wanted equal parenting time. Similarly, he first testified that he did not seek to have input into decisions regarding Tate's medical care, education, and religious upbringing as long as Emily kept him informed on these issues, but he then testified that he would like to have such input. However, the relevant legal question is not whether Evan could adequately describe joint custody. (Emily also appeared unaware of the legal standard for custody determinations,

testifying that she wanted "final say" over decisions about Tate's upbringing (*i.e.*, sole legal custody) simply because she had had that control in the past.)  Rather, the issue is whether joint custody, including shared decision-making, was in Tate's best interest.  750 ILCS 5/602.1 (West 2014); see also Pub. Act 99-90, § 5-20 (eff. Jan. 1, 2016) (adding 750 ILCS 5/602.5).  While not completely irrelevant, the parties' legal understanding of joint custody is not determinative of that issue.

¶ 19    Emily also argues that the trial court should not have found that the parties could cooperate well enough to permit joint custody, as they had no history of any agreements. However, both parties repeatedly testified, in hearings over the course of the case, that they often worked together to resolve problems that arose with visitation, child care, and other issues. Thus, the trial court's determination that they could cooperate sufficiently to permit joint parenting was not against the manifest weight of the evidence.[3]

¶ 20                              B. Visitation Schedule

¶ 21    Emily's arguments regarding the visitation schedule entered by the trial court are not clearly laid out and are somewhat confusing.  Emily begins by arguing that, in a parentage case, the burden is on the noncustodial parent to show that visitation is in the child's best interest. *J.W.*, 2013 IL 114817, ¶ 53.  While she correctly states the law, she never argued before the trial

---

[3] In the portion of her brief relating to custody, Emily alludes to the fact that the trial court appeared to know Evan's father (a deputy) and addressed him *sua sponte* at one point during the July 2015 hearing, commenting on the excessive heat in the courtroom.  However, Emily does not actually argue that the trial court was biased in favor of Evan.  (Nor, in our view, would the record support such an argument.)  Accordingly, we need not address the trial court's familiarity with Evan's father.

court that it would be in Tate's best interest not to have any visitation with Evan. To the contrary, she and Evan entered into agreed orders establishing temporary visitation schedules. Further, although in March 2015 Emily filed a motion to modify Evan's visitation to include supervision by Evan's mother, she never sought to prevent visitation entirely. In May 2015, the trial court denied that motion and instead ordered that Evan's visitation remain unsupervised and increase to thrice-weekly three-hour visits and alternate Sunday afternoons. At the July 2015 hearing, Emily did not testify that she had any concerns arising from that visitation schedule; indeed, she testified that she and Evan had worked out a similar schedule themselves. Accordingly, we find that Emily has forfeited any argument that it is not in Tate's best interest to have at least some visitation with Evan.

¶ 22 Instead, we view Emily as arguing that Evan has not carried his burden of proving that the amount of visitation ordered by the trial court (in particular, overnight visitation beginning when Tate is 15 months old) is in Tate's best interest. At the July 2015 hearing, Emily testified that, although Tate had begun eating solid food, she still nursed him periodically during the day and nursed him to sleep every night, which was working well for Tate. Tate did take naps while he was in Evan's care. However, Tate was still waking once or twice during the night, and she would nurse him back to sleep then. Accordingly, she was opposed to Tate having overnight visits with Evan until Tate was no longer being nursed to sleep at night. She believed that this would occur by the time Tate was two years old. On cross-examination, Emily conceded that Tate had taken a bottle. (At an earlier hearing, as noted, Emily had testified that she prepared a bottle of breast milk for Tate's longer visits with Evan.) Evan testified that he would like the opportunity to care for Tate when Tate woke up in the middle of the night.

¶ 23    The trial court found that Tate was doing well and that it would be in Tate's best interest to develop a strong bond with his father through substantial visitation, including the gradual introduction of overnight visits.  On appeal, Evan notes his request, early in the case, for overnight visitation, and Emily's testimony that Tate could take a bottle.  Emily does not point to any evidence that Tate could not begin overnight visits at age 15 months, other than her own view that Tate should continue to be nursed to sleep every night.  (Emily tried to introduce a letter from Tate's health care provider regarding breast-feeding, but Evan objected on the grounds of hearsay.  Emily did not overcome the hearsay objection and the letter was not admitted into evidence.  Emily has not argued on appeal that this ruling was erroneous.)  As there was evidence supporting the trial court's ruling on this issue and Emily's opinion was the only contrary evidence, we cannot say that the trial court's determination was against the manifest weight of the evidence.

¶ 24    Emily argues that the trial court's selection of 15 months as the appropriate age for Tate to begin overnight visits with Evan was arbitrary.  However, the parties' positions created a conflict: Evan argued for the immediate commencement of overnight visits, while Emily testified that overnight visits could begin when Tate was two, when she would no longer be nursing him.  The trial court was required to resolve this conflict (*People v. Collins*, 106 Ill. 2d 237, 261-62 (1985)), and its selection of a date between the two parties' positions was not against the manifest weight of the evidence.  Accordingly, we find no error in the trial court's resolution of the issue of overnight visitation.

¶ 25                              C. Name Change

¶ 26 Emily next contends that the trial court erred in ordering that Tate's last name be changed from her surname to Evan's surname. We agree. We begin with a brief historical outline of the legal rights and duties of unmarried parents with respect to their children.

¶ 27 A century ago, a child of unmarried parents was considered *filius nullius*, the "child of no one," a child without legal parents, who could inherit from no one. *People v. Moczek*, 407 Ill. 373, 380 (1950). In *Smith v. Garber*, the Illinois Supreme Court noted the passage of state laws ameliorating this harsh rule and held that, in keeping with the intent of those statutes, a child of unmarried parents was, legally speaking, the child of his or her mother. *Smith v. Garber*, 286 Ill. 67, 71 (1918); see also *Moczek*, 407 Ill. at 380 ("The common-law rule has been abrogated in Illinois so as to make him the lawful child and heir of his mother."). At some point, paternity laws changed further to provide that, once a man is legally determined to be the father of a child, he can seek visitation and custody of the child, and the determination of those issues will be made solely on the basis of the best interest of the child. Nevertheless, the circumstances under which an unmarried parent may petition to change the name of his or her child are limited, and the statutory provisions permitting such a change place a heavy burden on such a petitioner.

¶ 28 At the time the trial court entered its order here, the name of a child of unmarried parents could be changed pursuant to one of two statutes. The first was section 14(e) of the Parentage Act, which required a court to order a change in a child's name when both parents agreed on such a change. 750 ILCS 45/14(e) (West 2014) ("On request of the mother and the father, the court shall order a change in the child's name."); see also Pub. Act 99-85 (eff. Jan. 1, 2016) (adding 750 ILCS 46/802(h) ("On the request of both parents, the court shall order a change in the child's name.") That statute was not applicable here, where Evan sought to change Tate's surname and Emily objected to such a change.

¶ 29    The other statute permitting a name change is section 21-101 of the Code of Civil Procedure (Code) (735 ILCS 5/21-101 (West 2014)).  This is the statutory provision cited by Evan in his motion for a name change, and it is the provision applicable here.

¶ 30    Because a change in the name of a child is a serious matter with far-reaching effects, section 21-101 permits such a change "*only* if the court finds by *clear and convincing* evidence that the change is *necessary* to serve the best interest of the child."  (Emphases added.)  *Id.*  In determining whether a name change is necessary to serve the best interest of a child, a court "shall consider all relevant factors," including the wishes of the child's parents and any other person with physical custody of the child; the child's own wishes; the interaction between the child and any siblings, step-parents, or step-siblings; and the impact of a name change on the child's relationships within the child's home, school, and community.  *Id.*  A trial court's decision on a name-change request will be affirmed unless it is against the manifest weight of the evidence.  *Stockton v. Oldenburg*, 305 Ill. App. 3d 897, 899 (1999).

¶ 31    In *Stockton*, a father whose surname was Oldenburg sought to change his child's name from Lauren Joanne Stockton (Stockton was the mother's surname) to Lauren Stockton Oldenburg.  *Id.*  At the hearing on the father's petition, the father submitted two items of evidence in support of the name change:  his own belief that the change would allow the child to identify more closely with him, and the testimony of a clinical psychologist that " 'it could be nice' " for the child to have both parties' names.  *Id.* at 900.  The trial court denied the petition, and the reviewing court affirmed.  Although the reviewing court recognized that "a noncustodial parent is at a disadvantage in maintaining a strong relationship with the child and the child carrying that parent's name may demonstrate a noncustodial parent's continuing interest in and identity with the child" (*id.* (citing *In re Marriage of Presson*, 102 Ill. 2d 303, 312 (1984))), it

nevertheless found that the father had not carried his burden of proof for the name change: "in this case, the evidence only established that a name change 'could be nice.' That does not make it *necessary*. The conflicting desires of the parents cancel each other out, to some extent, and the remaining evidence does not establish that a name change is required or is in Lauren's best interests." (Emphasis in original.) *Id.*

¶ 32   We find the reasoning of *Stockton* applicable here. Evan presented even less evidence to support his request to change Tate's surname than did the father in *Stockton*: the only such evidence was his own opinion that "there was no reason for my name not to be up there" (*i.e.*, used as Tate's surname). Emily contradicted this assertion, testifying that she gave Tate her last name because Evan was present only sporadically during her pregnancy but she knew that she would always be there for Tate. As in *Stockton*, Evan's evidence is simply insufficient to meet the statutory standard of clear and convincing evidence demonstrating that a name change is necessary to serve the child's best interests. Accordingly, we hold that the trial court's determination that Tate's surname should be changed to Evan's surname was against the manifest weight of the evidence.

¶ 33   We note that, in ruling on Evan's name-change request, the trial court made no reference to the statutory factors, nor did it identify the evidence upon which it was basing its decision. While a trial court is under no obligation to explicitly address each applicable statutory factor or the evidence that it found compelling, the record must "reflect that the court considered evidence of the statutory factors" in making its decision. *Sullivan v. McGaw*, 134 Ill. App. 3d 455, 465 (1985). The failure to do so is error. *Id.*

¶ 34   Here, the trial court stated only that it was changing Tate's surname to Evan's surname and making Emily's surname one of Tate's middle names because Tate's name "should include

both of his parents' last name[s]" so that he would "have a demonstrable connection to both his parents." However beneficial this outcome might be, it is unclear why it requires the substitution of Evan's surname for Emily's. The benefit of including both parents' surnames as part of Tate's full name does not, in itself, meet the requirement of section 21-101 to show that changing Tate's last name is necessary. Indeed, we are unaware of any comparable case in which a child of unmarried parents was given the mother's surname at birth and a court upheld the replacement of that surname with the father's surname.

¶ 35    Although the modern law of parentage grants an unmarried father substantial rights to his child's upbringing and company, it does not reflect any preference that a child of unmarried parents should bear the father's name. To the contrary, where the parents of a child do not agree on a name change, the law requires the parent seeking the change to demonstrate by clear and convincing evidence that the change is necessary for the best interest of the child. 735 ILCS 5/21-101 (West 2014). The statutory requirement of "clear and convincing evidence" is a further indication that a child's name may be changed only where the evidence unmistakably supports such a change. *Bazydlo v. Volant*, 164 Ill. 2d 207, 213 (1995) ("Courts have defined 'clear and convincing' evidence most often as the quantum of proof that leaves no reasonable doubt in the mind of the fact finder as to the truth of the proposition in question.").

¶ 36    Given that the evidence did not support a finding that a name change was necessary to serve Tate's best interest, the trial court potentially could have advanced the goal of including both parents' surnames by adding Evan's surname as an additional middle name. See *Dattilo v. Groth*, 222 Ill. App. 3d 467, 469 (1991) (the change of a middle name is not as disruptive as changing a child's last name). We do not mean to express the opinion that this result should have been the trial court's choice; we simply find that the desire to include both parents'

surnames does not mean that changing the child's surname is *necessary*. Accordingly, this desire is insufficient to meet the statutory standard.

¶ 37    Evan argues on appeal that we should not apply the "necessary" standard set out in section 21-101 of the Code, because that statute applies only when "there is no custodial dispute regarding the name change." In support, Evan cites *In re Wright*, 363 Ill. App. 3d 894, 896-97 (2006).

¶ 38    We reject Evan's argument for two reasons. First, he brought his motion pursuant to section 21-101 of the Code, identifying that provision as the legal basis for his request. Thus, Evan expressly invoked section 21-101 as the law applicable to his name-change motion, and he cannot now be heard to argue against the application of that statute. *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004) (citing *McMath v. Katholi*, 191 Ill. 2d 251, 255 (2000) and *People v. Segoviano*, 189 Ill. 2d 228, 240-41 (2000)).

¶ 39    Second, we disagree that *Wright* should be applied to mandate a different result. In Wright, the parties had joint legal custody of the child and disagreed over the issue of the child's surname. The father filed a petition to change the child's surname to his own, pursuant to section 21-101 of the Code, in a proceeding separate from the parentage proceedings. The trial court granted the petition. *Wright*, 363 Ill. App. 3d at 896. The reviewing court held that a petition under section 21-101 before a judge other than the judge presiding over the parentage proceedings "was not the appropriate means to resolve the dispute" over the child's surname. Instead, as "changing a child's name is a matter incident to custody of the child" (*Presson*, 102 Ill. 2d at 307), where a trial court already has jurisdiction over the custody of the child, that court should be the one to determine whether the child's name should be changed. *Wright*, 363 Ill.

App. 3d at 897. Thus, the reviewing court reversed the trial court's order, commenting that the father could renew his petition before the parentage court. *Id.*

¶ 40    *Wright* is not applicable here, where the name-change request was correctly filed within the parentage case. Further, to the extent that Evan is suggesting that the "necessary" standard of section 21-101 does not apply when a name-change request is filed before a court having jurisdiction over custodial matters, he is incorrect. Nothing in *Wright* suggests that the parentage court, which was the correct forum for the father's name-change petition, should apply a lesser standard. *Id.*; *cf. In re Marriage of Charnogorsky*, 302 Ill. App. 3d 649, 659 (1998) (name-change dispute could potentially be resolved in a custody proceeding, even if the noncustodial father lacked standing to bring a stand-alone name change petition under section 21-101; however, court made no statement suggesting that some other standard should be applied when deciding the issue within a custody proceeding). Accordingly, the trial court's grant of Evan's petition for a name change is reversed.[4]

¶ 41                                   D. Child Support

¶ 42    A trial court must exercise its discretion in determining the appropriate amount of child support, and we will not overturn its decision unless it has abused that discretion. *In re Marriage*

---

[4] We note that, technically, Evan lacked standing to request to change Tate's name because, at the time he filed that request, he did not have legal custody of Tate. See 735 ILCS 5/21-102 (West 2014) (a name change petition involving a minor must be signed by "the parent or guardian having the legal custody of the minor"); see also *Charnogorsky*, 302 Ill. App. 3d at 659. However, lack of standing is an affirmative defense that can be forfeited if it is not raised. *Lebron v. Gottlieb Memorial Hospital*, 237 Ill. 2d 217, 252-53 (2010). Emily did not raise the issue of Evan's standing to request a name change. Thus, she has forfeited that defense.

*of Hill*, 2015 IL App (2d) 140345, ¶ 17. Emily argues that the trial court abused its discretion in setting the amount of Evan's child support obligation at $40 per week, because the statutory guidelines called for a higher amount and the trial court gave no reason for its downward deviation. We agree.

¶ 43    Under section 14(a) of the Parentage Act (750 ILCS 45/14(a) (West 2014)), a court hearing a parentage case must determine the amount of child support "in accordance with the relevant factors set forth in the Illinois Marriage and Dissolution of Marriage Act" (750 ILCS 5/101 *et seq.* (West 2014)). That section continues, "[s]pecifically, in determining the amount of any child support award ***, the court shall use the guidelines and standards set forth in" section 505(a) of the Marriage Act (750 ILCS 5/505(a) (West 2014)). 750 ILCS 45/14(a) (West 2014). Thus, the trial court here was required to apply section 505(a) of the Marriage Act in setting Evan's child support obligation.

¶ 44    Section 505(a) sets out guidelines equivalent to percentages of the obligor's net income, with the applicable percentage depending on the number of children to be supported. In this case, where the parties have only one child, the guideline is 20% of Evan's net income. Section 505(a) also requires that the guidelines be used unless the trial court finds that a deviation is warranted. 750 ILCS 5/505(a)(2) (West 2014) ("The above guidelines shall be applied" unless the court makes a finding that application of the guidelines would be inappropriate). "Compelling reasons must be presented to overcome the presumption that the guidelines will be applied." *Anderson v. Heckman*, 343 Ill. App. 3d 449, 454 (2003); see also *In re Marriage of Garrett*, 336 Ill. App. 3d 1018, 1022 (2003) ("case law has imposed a presumption that the guidelines apply absent compelling reasons"; citing cases). The burden of showing that such

compelling reasons exist is on the party seeking the deviation from the guidelines. *Garrett*, 336 Ill. App. 3d at 1022.

¶ 45 Here, Evan did not submit any financial affidavit. (We are somewhat surprised that the trial court apparently never ordered the parties to do so.) However, at the July 2015 hearing, he testified as to his income. At that time, he was delivering pizzas five nights per week. He was paid $25 to $30 per night by his employer (in cash) and also received tips from customers. At one point, he testified that he could make $500 per week; at another point, he testified that he could make $75 per night (including tips), which would equate to $375 per week. Although he had also worked in construction for a few weeks, he left that job and returned to pizza delivery because he could make better money in fewer hours. Evan testified that he had never filed an income tax return. (At a prior hearing, he testified that he was working at the pizza delivery job in 2014 as well.) However, he expressed a willingness to do so in the future. A pay stub from the construction company showed that in May 2015 he had been paid $708.13 (net of withholding for taxes) for two weeks' work. During closing arguments, Evan's counsel argued that it should not be presumed that Evan would not pay taxes on his pizza delivery income, and that, based upon the construction job, Evan should pay $71 per week in child support. Emily's counsel argued that, based on Evan's $500-per-week estimate of his pizza delivery income and the fact that he had never paid taxes on that income, he should pay $100 per week.

¶ 46 In its judgment order, the trial court set Evan's child support obligation at the same $40 per week that Evan had been paying voluntarily in the past, describing that amount as "20% of his net income." However, this ruling—which equates to a finding that Evan's net weekly income was $200—is unsupported by any evidence in the record. Rather, the evidence suggests that Evan's net weekly income was about twice that amount, between $354.06 and $500. The

court's order contains no indication that the court intended the $40 weekly support obligation it set to be a deviation from the statutory guidelines, much less any explanation of why such a deviation would be warranted here, where Evan is living in his parents' home and likely has few living expenses. Accordingly, we are compelled to find that the court abused its discretion in setting the amount of child support. We reverse this portion of its judgment and remand so that the court can make an evidence-based finding of Evan's net income, enter a corresponding child support obligation, and make a proper calculation of the arrearage he owes.

¶ 47                               E. Medical Expenses

¶ 48     The final issue raised on appeal concerns the manner in which the trial court ordered Evan to reimburse Emily for her medical expenses related to her pregnancy and Tate's birth. The trial court found that those expenses totaled $1,865.71 and that Evan should pay half, or $932.85. Emily does not take issue with this finding. However, she challenges as unreasonable the trial court's determination that Evan should pay only $5 per week toward the retirement of this debt.

¶ 49     Emily argues that this slow rate of repayment is unreasonable because it unfairly places on her much of the burden to make immediate payment of Evan's share of the expenses: at this rate, it will take Evan over three and a half years to fully reimburse Emily, but it is unlikely that Emily's creditors will be willing to wait that long for payment. We agree that the evidence suggests that Evan could reimburse Emily more quickly. Further, the trial court has not provided us with any clue as to its reasoning in setting such a slow rate of repayment. Accordingly, we reverse the portion of the trial court's judgment setting the $5-per-week repayment rate. On remand, the court shall reconsider the issue, setting a repayment rate that balances the burden on both parties.

¶ 50                                    III. CONCLUSION

¶ 51    For the reasons stated, we affirm the judgment of the circuit court of Ogle County as to the award of joint custody and the visitation schedule, and we reverse as to Tate's surname, the amount of child support, and the rate at which Evan must reimburse Emily for medical expenses. We remand for further proceedings consistent with this opinion.

¶ 52    Affirmed in part and reversed in part; cause remanded.