2019 IL App (3d) 170759

Opinion filed June 6, 2019

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2019

| | | |
|---|---|---|
| *In re* M.E., | ) | Appeal from the Circuit Court |
| | ) | of the 14th Judicial Circuit, |
| a Minor | ) | Henry County, Illinois. |
| | ) | |
| (Julie M., | ) | |
| | ) | Appeal No. 3-17-0759 |
| Petitioner-Appellant, | ) | Circuit No. 17-MR-67 |
| | ) | |
| v. | ) | |
| | ) | |
| Gerald E., | ) | The Honorable |
| | ) | Dana R. McReynolds, |
| Respondent-Appellee). | ) | Judge, presiding. |

JUSTICE CARTER delivered the judgment of the court, with opinion.
Justices Holdridge and O'Brien concurred in the judgment and opinion.

**OPINION**

¶ 1        Julie M., the biological mother of the minor, M.E., filed a petition to change the minor's

legal last name from that of the minor's biological father to that of the minor's stepfather, Julie's

current husband. Gerald E., the minor's biological father and an inmate in the Department of

Corrections (DOC), opposed the petition. Following a hearing, the trial court found that Julie had

failed in her burden to show by clear and convincing evidence that the name change was

necessary to serve the best interest of the minor. The trial court, therefore, denied the name-

change petition. Julie appeals. We reverse the trial court's judgment and remand this case with directions to the trial court to enter an order granting the name-change petition.

¶ 2                                                    FACTS

¶ 3         Julie and Gerald were in a dating relationship for about six years and lived together from time to time but never got married. In May 2006, Julie gave birth to Gerald and Julie's daughter, M.E. In April 2009, Gerald's paternity of M.E. was established. At some point prior to December 2009, Julie and Gerald's dating relationship ended. In December 2009, Gerald broke into Julie's apartment while M.E. was present, held Julie at gunpoint, and kept Julie hostage in the apartment. Gerald was later convicted of certain criminal offenses related to that incident and was sentenced to 50 years in prison. At the time Gerald went to prison, M.E. was 3½ years old.

¶ 4         At some point in 2010, Julie began dating her current husband, Gary M. Julie and Gary started living together about six months later, and M.E. lived with them. In September 2011, Gary and Julie got married, and Julie took Gary's last name as her own. At about that same time or shortly before, Julie and Gary decided that M.E. would use Gary's last name as her own as well. With the school's permission, they registered M.E. for kindergarten under the name of M.M. using Gary's last name for M.E. For the next six years, M.E. went about her daily life using the name M.M., except for such things as medical visits where her legal last name was required. M.E. identified herself as M.M. and was known by the school, the community, and all of her friends as M.M.

¶ 5         In April 2017, Julie filed the instant petition to change M.E.'s legal last name from Gerald's last name to Gary's. The petition was filed pursuant to section 21-101 of the Code of Civil Procedure (Code) (735 ILCS 5/21-101 (West 2016)). Julie alleged in the petition that the name change was necessary to serve M.E.'s best interest due to Gerald's infamy.

¶ 6    Gerald filed an answer and opposed the petition. Gerald asserted in his answer that prior to his arrest, he was actively involved on a daily basis in M.E.'s life; that throughout his incarceration, he had attempted to maintain contact with M.E. by sending cards and letters; that his last name was an extremely common one that would not cause M.E. any hardship; and that M.E. could change the name herself, if she so desired, when she reached legal age.

¶ 7    On Gerald's motion, the trial court appointed a guardian *ad litem* (GAL) for M.E. The GAL later filed a written report with the trial court. In the report, the GAL stated that he had interviewed Julie, Gary, and M.E. At least a portion of M.E.'s interview was conducted outside the presence of Julie and Gary. From those interviews, the GAL learned that M.E. had used Gary's last name from about the time when M.E. started kindergarten and was four or five years old. M.E. had little to no contact with Gerald, and any contact that she did have was infrequent and intermittent. M.E. understood that Gary was not her biological father, but she felt that Gary was her true father and she loved Gary very much. M.E. wanted to use Gary's last name (Julie's current last name) as her own and did not know why her last name should be the same as Gerald's when she had hardly, if ever, seen Gerald. During his work on the case, the GAL observed M.E.'s home and room. On her books, artwork, and other papers, M.E. used Gary's last name as her own. She also used Gary's last name on all of her team and school jerseys that had a last name on the back of them. The only time that M.E. used Gerald's last name was if she was at the doctor's office or had to use her legal name for some reason. At the conclusion of his report, the GAL stated that he believed the name change was in M.E's best interest and that he was recommending that the trial court grant Julie's petition.

¶ 8    In October 2017, a hearing was held on the name-change petition. The hearing took one day to complete. During the course of the hearing, the trial court heard the testimony of Julie,

Gary, Julie's adult daughter (M.E.'s half sister), Gerald, the GAL, and Gerald's brother. The parties elected not to call M.E. to testify and chose instead to rely on the GAL's interview of M.E. The testimony presented at the hearing established many of the facts as set forth above. In addition to those facts, the testimony presented can be summarized as follows.

¶ 9 Julie testified that she was 52 years old and had three children. M.E. was Julie's youngest child and was 11 years old as of the date of the hearing in the instant case. Julie, Gary, and M.E. currently lived in Atkinson, Illinois, and had lived in Atkinson for the past 1½ years. Prior to that time, they lived in Geneseo, Illinois.

¶ 10 Julie and Gary had gotten married in September 2011 when M.E. was five years old and had been married since that time. About the same time as Gary and Julie's wedding, M.E. started kindergarten. When M.E. did so, she used Gary's last name as her own. The school allowed M.E. to use Gary's last name, and M.E. had done so for the entire time that she had been in school.

M.E. always signed her artwork and assignments at school using Gary's last name and never corrected anyone if they referred to Gary as her father. All of M.E.'s sports jerseys and gym shirts had Gary's last name on the back of them. M.E. referred to Gary as "dad" or "daddy." M.E. never asked any questions about Gerald. The only time M.E. used Gerald's last name was when she was in the hospital or had certain doctor appointments. During the course of M.E.'s life, Julie had never heard M.E. introduce herself using Gerald's last name. According to Julie, M.E. wanted to change her last name so that she would have the same last name as her mom and dad (Gary). Julie wanted that for M.E. as well. When Julie was asked what negative consequences would result from M.E. continuing to use Gerald's last name as her legal last name, Julie responded that she felt that it would be very difficult for M.E. because M.E. had

always used Gary's last name for as long as M.E. could remember, all of M.E.'s friends knew M.E. by Gary's last name, and it would be conflicting for M.E. to use Gerald's last name.

¶ 11        In December 2009, Gerald committed the offense for which he was in prison. Julie and Gerald were separated at that time. Gerald broke into Julie's apartment when Julie, Julie's son, and M.E. were present; kicked down the door; held Julie at gunpoint; and kept Julie hostage in the apartment. Gerald released Julie's son and M.E. from the apartment shortly after the incident began. M.E. remembered some things about the day of the incident. Prior to Gerald's arrest in December 2009, he and M.E. had a good relationship and were very close. However, from the time that Gerald went to prison, his contact with M.E. had been sporadic. Gerald would send M.E. birthday or holiday cards occasionally but would not do so every year. The last time that Gerald had contact with M.E. was in December 2016 when he sent M.E. a holiday card. Gerald had not attempted to contact M.E. by telephone. In addition, Gerald did not in any of his letters ask Julie for her phone number or ask Julie to have M.E. call him. In the letters that Julie sent Gerald, she discussed whether Gerald had put her on his visitor's list at the prison, but Gerald never confirmed that he had done so. Gerald also never told Julie that he had put M.E. on his visitor's list.

¶ 12        Julie did not attempt to keep Gerald or Gerald's family apprised of what was going on in M.E.'s life after Gerald went to prison. A few months after Gerald was incarcerated, Julie sent some pictures of M.E. to Gerald's mother. Gerald's brother called Julie and told her very angrily never to contact his family again. Julie abided by that request. The only other contact Julie had from Gerald's family was on one occasion when Gerald's ex-wife stopped by Julie's home with two of Gerald's daughters, M.E.'s half sisters. In Julie's opinion, however, the two half sisters

were not trying to establish a relationship with M.E. Other than those two incidents, no one from Gerald's family had ever contacted Julie or told Julie that they wanted to have contact with M.E.

¶ 13　　　Gerald did not have Julie's current address but did have the address of a mutual friend, Natasha N., that he always corresponded through. Natasha had agreed to serve as Gerald's way of staying in contact with M.E. Natasha, however, had moved a few times since Gerald had gone to prison. Gerald had told Julie that he would not contact Julie at her home address because he did not want to cause any conflict in her marriage.

¶ 14　　　Julie acknowledged that she had sent Gerald a letter in January 2013 while Gerald was in prison and that she had stated in that letter that things were moving forward that would be much less difficult if Gerald would allow Gary to adopt M.E. Julie also stated in that same letter that what "they" needed was for Gary to adopt M.E. Julie explained, however, during her testimony that at the time of the January 2013 letter, she felt that she needed M.E. to move forward knowing that Gary was going to be her dad and that Gary was going to raise her. Julie acknowledged during her testimony, though, that up until the point of the instant hearing, everything had been functioning for Julie, Gary, and M.E. with M.E. having Gerald's last name as her legal last name. Julie acknowledged further that she had told Gerald that she would keep any correspondence that Gerald had sent M.E. and would let M.E. view the correspondence when M.E. was old enough and mature enough to do so. Julie also acknowledged that she had stated in a letter that she had sent to Gerald in March 2014 when M.E. was almost eight years old, that M.E. had not forgotten Gerald. Julie explained during her testimony, however, that her statement in the letter was not true and that she was just trying to be nice because she knew Gerald would be in prison and would not be able to raise or parent M.E.

¶ 15     During Julie's testimony, the trial court asked Julie some questions of its own. In response to those questions, Julie testified that she had registered M.E. for school prior to the time that Gary and Julie had actually gotten married and that she had used Gary's last name as M.E.'s last name. Doing so was something that Julie had decided to do and that the school allowed. The school requested, however, that Julie legally change M.E.'s last name to Gary's by the time M.E. was in middle school, which was why Julie and Gary were in court now. Julie lived with Gary for about a year before they got married. M.E. had used Gary's last name as her own since about six months before Julie and Gary got married. Prior to the date of Gerald's offense (December 2009), Gerald was required to pay support for M.E. pursuant to a support order and paid support on and off.

¶ 16     Gary testified that he was 54 years old, was married to Julie, and had known M.E. since M.E. was three years old. Gary and Julie had gotten married in September 2011 when M.E. was five. Prior to getting married, Gary and Julie dated for about a year and lived together for about six months. M.E. lived with Gary and Julie during that time period as well. M.E. called Gary "daddy" even though Gary had not told M.E. to do so. Gary wanted M.E.'s last name to be the same as his for family purposes and because he eventually wanted to adopt M.E. M.E. had gone by Gary's last name since Gary and Julie were married and M.E. was in kindergarten. Gary and Julie wanted M.E. to be part of the wedding ceremony so they told M.E. that when Julie's last name changed, M.E.'s last name was changing as well. Now, Gary and Julie wanted to make the change legal. Prior to the wedding, M.E. never expressed a preference as to what she wanted her last name to be. Gary was not even sure if M.E. knew what her last name was at that time. Gary performed all of the caretaking functions for M.E. that a father would perform, including financial support, emotional support, and taking M.E. to school functions and other activities.

M.E.'s life with Gary and Julie was all that M.E. had known. Whenever anyone in school asked M.E. who she was, she always used Gary's last name. M.E. did well in school and was well adjusted in her community. M.E. was known in the community by Gary's last name. If an individual called M.E. by Gerald's last name, people in the community would not know to whom that individual was referring.

¶ 17 On cross-examination, when Gary was asked what made it easier to have M.E.'s last name legally changed now to Gary's when things had been functioning fine up until this point, Gary responded that the reason it took them six years to seek to legally change M.E.'s last name was for financial reasons. Gary and Julie thought that Gerald would fight them on the change and they needed to make sure they had enough money to fight that battle. Otherwise, Gary and Julie would have sought to change M.E.'s last name immediately. Gary and Julie had twice asked Gerald for permission for Gary to adopt M.E., but Gerald did not respond.

¶ 18 Kristen S.-J. testified that she was Julie's 26-year-old daughter. In addition to Kristen and M.E., Julie had one other child, Kristen's younger brother. Kristen spent time with Julie, Gary, and M.E. on a weekly basis. They had family dinners together and did social things together as a family. Kristen was very close to Julie and M.E. M.E. looked up to Kristen, and she and Kristen did a lot of things together. M.E. would come over to Kristen's residence and stay with Kristen and her husband. Kristen had been actively involved in M.E.'s life since M.E. was born. Kristen had never heard M.E. refer to herself using Gerald's last name. According to Kristen, as soon as M.E. started kindergarten, she identified with Gary's last name and would refer to herself using Gary's last name. M.E. referred to Gary as "daddy." Kristen had never heard M.E. talk of or mention Gerald. M.E. was a very happy and well-adjusted child. She was very smart and did

very well in school. She was very opinionated and had no problem telling you what was on her mind.

¶ 19     The GAL testified in a manner that was consistent with his report. The GAL did not interview Gerald but inferred what Gerald's wishes were from the fact that Gerald was opposing the name-change petition. The GAL assumed that Gerald had a phone number by which to contact M.E.

¶ 20     David E., Gerald's brother, testified that Gerald and David's mother, who had a history of a heart condition, became very distraught when she received the pictures that Julie had sent. After Gerald and David's mother received the pictures, David called Julie and told her not to contact anyone in their family again. David was very upset at the time and cussed on the phone when he talked to Julie. According to David, his anger was not toward Julie; it was that Julie had put Gerald and David's mother in distress by mailing her the photos. Since that phone conversation, David had not attempted to make any contact with Julie. David had thought about making contact with M.E. at one point when he saw M.E. at a park a few months after Gerald had gone to prison but decided not do so because he did not want the drama. M.E. did not recognize David on that occasion but did recognize David's children.

¶ 21     Gerald testified on his own behalf and read for the court a letter or e-mail that he had sent to some of his other children and grandchildren in June 2017. In the letter, Gerald told his children and grandchildren that he loved them, that it was difficult for him to accept that he had not been there for the milestones in their lives, and that he felt pain for the pain that they had suffered because of his absence. Gerald then went on to give his children and grandchildren some fatherly/grandfatherly advice on life in general.

¶ 22          On cross-examination, Gerald stated that his estimated release date from prison was in June 2051 or 2052. M.E. would be over 40 years old at that time. According to Gerald, he had placed Julie on his visitors list at the prison and had told Julie that he had done so by writing their mutual friend, Natasha. Gerald stated further that over the years, he had sent M.E. over a dozen letters. Gerald could not call phone numbers from prison without the recipient having an account set up. Gerald wrote Natasha and asked her to set up an account on either her phone or Julie's phone so he could call and talk to them.

¶ 23          In rebuttal, Julie testified that Gerald had never asked her by way of a letter to Natasha to set up an account so he could call and speak to M.E. Julie also had never received notification from Gerald or DOC that she had been added to Gerald's visitor list.

¶ 24          In addition to the testimony, during the hearing, the trial court received into evidence several pieces of documentary evidence, including M.E.'s grade reports, one of M.E.'s kindergarten report cards, and some of the letters that Julie had sent to Gerald after Gerald had been incarcerated. The trial court also had before it the GAL's report and had taken judicial notice of some of Gerald's prior criminal cases, including the one for the December 2009 incident for which Gerald was incarcerated.[1] Of relevance to this appeal, the grade reports and the report card showed that M.E. was a good student, that M.E. received mostly "A"s in school, and that Gary's last name had been used as M.E.'s last name on those documents. The important aspects of the other documents have already been set forth above.

¶ 25          After all of the evidence had been presented, the parties made their closing arguments. Gerald argued in his closing argument that granting the name-change petition was not in M.E.'s

---

[1] The court files for the prior criminal cases of which the trial court took judicial notice have not been made part of the record on appeal.

best interest.[2] Gerald asserted that he loved M.E.; that, prior to his arrest, he and M.E. had a close relationship; that he had tried to communicate with M.E. over the years by mail, but Julie had not allowed it; that he had presented evidence that contradicted Julie's claim that he was a bad person; that M.E. was not a victim of the offense he had committed; that his last name was an extremely common one; that M.E. would not suffer any hardship as a result of using Gerald's last name as her legal last name; that Julie, Gary, and M.E. had maintained normal lives up until the current point without changing M.E.'s legal last name to Gary's; that no benefit of the name change, other than personal gain, had been proven; and that it would be a "tragedy" to deny M.E. a relationship with her family on Gerald's side.

¶ 26        In her closing argument, Julie pointed out to the trial court the four statutory factors that applied to a name-change petition and discussed how the evidence presented related to each of those four factors. Julie argued that at least three, and quite possibly all four, of the statutory factors weighed in favor of allowing the name-change petition in that both Julie and Gary wanted M.E.'s last name to be changed; M.E. wanted her last name to be changed; M.E. recognized Gary as her father and barely remembered Gerald; Gerald's family had instructed Julie not to contact them regarding M.E.; M.E. had only seen her half siblings on Gerald's side one time and had barely recognized them; M.E. was closely bonded to her half siblings on Julie's side; M.E. identified herself using Gary's last name; Gerald had done only the bare minimum to try to remain in contact with M.E.; M.E. had been using Gary's last name since she had started elementary school, was doing well in school, and was well adjusted; and granting the petition would not terminate Gerald's parental rights.

_____

[2] Gerald went first with his closing argument because Julie waived summation. Julie made all of her closing comments during the rebuttal portion of her closing argument.

- 11 -

¶ 27    At the conclusion of the hearing, the trial court found that Julie had failed to prove by clear and convincing evidence that the name change was necessary to serve the best interest of M.E. In reaching that conclusion, the trial court stated, in pertinent part:

> "All right. The evidence before the Court is that at an early age, the age when the child started school, kindergarten, that she was enrolled in school by the mother under the name of [M.M.[3]] and that has continued with the consent of the school up through the present day. It's not surprising, given that age and the enrollment under that name, that the child has gone by the name and considered herself [M.M.] since that period of time. But the reason for that is because she wasn't enrolled as [M.E.]. She was enrolled as [M.M.] and has gone by that name because—largely because it was more convenient and—and better for Julie and her new family to do that, not because any wishes or desires at the time that—that that all started of [M.E.]. There's been no evidence before the Court that she was aware other than the fact that she was enrolled in school and the teachers called her by that name throughout the school age and through the present that she was aware that she—she should be called anything else other than the testimony before the Court that in situations where a legal name was required, doctors, that sort of thing, that she used the name of [M.E.].
>
> *** So as said, it's not surprising that she has always gone by that name and apparently without any issues at this point. There's been no issues that have— have caused anything with regard to taxes, no issues with regard to the school being—allowing her to go by that name, no issues with regard to her medical

---

[3] While announcing and explaining its ruling, the trial court continuously misstated the last name that M.E. was currently using (Gary's last name).

treatment. She's expressed to the guardian *ad litem* that she doesn't want to change all of that [*sic*] circumstances at this point and there's no reason she should have to that I can see.

\* \* \*

\*\*\* [T]he main thing as far as the child is concerned is to have some continuity in her life with regard to the age that she is now until she can make some decisions on her own with regard to how she wants to live her life, what name she want to go by. If she gets married, she's going to change her name to something other than either [M.M.] or [M.E.] anyway. This petition is for the convenience of [Gary] and [Julie] and to basically put a rubber stamp on what has happened as far as enrolling [M.E.] in school since a very early age when she didn't know that she wasn't [*sic*] supposed to enroll as—as [M.E.].

The petition here, the basis for the allegation with regard to paragraph 7, that due to the natural father's infamy, it is in the best interest of the child to change her name; further, the child goes by the name of [M.M.]. I've already indicated it's—the reason that she goes by the name of [M.M.] is because that name was instilled in her at a very early age when she started school, and she's known nothing else.

As far as proving that [Gerald] as it relates to his potential to father or parent, I haven't heard anything today—other than the fact that he committed a terrible act and is in prison for it, I haven't heard anything either since that time or prior to that time that indicates in any way that he was not a good father or a good provider for all or any of his children, certainly for—for [M.E.].

I don't believe that you've met your burden here as far as this petition is concerned. I'm going to deny it."

¶ 28    Following the denial of her petition, Julie appealed.

¶ 29                                    ANALYSIS

¶ 30    On appeal, Julie argues that the trial court erred in denying her name-change petition. In support of that argument, Julie makes two assertions. First, Julie asserts that in making its ruling, the trial court failed to consider the language of the governing statute and the factors listed in that statute for deciding upon a name-change petition. Second, Julie asserts that the trial court's ruling was against the manifest weight of the evidence because all four of the statutory factors weighed in favor of granting the petition. Julie asks, therefore, that we reverse the trial court's ruling and that we enter an order changing the minor's legal last name to Gary's last name.

¶ 31    Gerald argues that the trial court's ruling was proper and should be upheld. Gerald asserts that (1) Julie failed to present sufficient evidence to substantiate any of her claims and to meet her burden of proof, (2) the hearing in the trial court was fair and impartial, and (3) the trial court's ruling was not against the manifest weight. For those reasons, Gerald asks that we affirm the trial court's judgment.

¶ 32    A trial court's ruling on a name-change petition will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Tate Oliver B.*, 2016 IL App (2d) 151136, ¶ 30. A ruling is against the manifest weight of the evidence only if it is clearly apparent from the record that the trial court should have reached the opposite conclusion or if the ruling itself is unreasonable, arbitrary, or not based upon the evidence presented. *Best v. Best*, 223 Ill. 2d 342, 350 (2006); *Meyers v. Woods*, 374 Ill. App. 3d 440, 449 (2007). Under the manifest weight standard, deference is given to the trial court as finder of fact because the trial court is in a better

- 14 -

position than the reviewing court to observe the conduct and demeanor of the parties and witnesses. *Best*, 223 Ill. 2d at 350. A reviewing court will not substitute its judgment for that of the trial court as to the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn from the evidence. *Id.* at 350-51.

¶ 33    In this particular case, Julie filed her name-change petition pursuant to section 21-101 of the Code. Section 21-101 provides, in pertinent part, as follows:

"An order shall be entered as to a minor only if the court finds by clear and convincing evidence that the change is necessary to serve the best interest of the child. In determining the best interest of a minor child under this Section, the court shall consider all relevant factors, including:

(1) The wishes of the child's parents and any person acting as a parent who has physical custody of the child.

(2) The wishes of the child and the reasons for those wishes. The court may interview the child in chambers to ascertain the child's wishes with respect to the change of name. Counsel shall be present at the interview unless otherwise agreed upon by the parties. The court shall cause a court reporter to be present who shall make a complete record of the interview instantaneously to be part of the record in the case.

(3) The interaction and interrelationship of the child with his or her parents or persons acting as parents who have physical custody of the child, step-parents, siblings, step-siblings, or any other person who may significantly affect the child's best interest.

(4) The child's adjustment to his or her home, school, and community." 735 ILCS 5/21-101 (West 2016).

¶ 34    As the above statute indicates, the circumstances under which a parent may petition to change the name of his or her minor child are limited, and the statutory provisions that allow for such a change place a heavy burden on the petitioner—the petitioner must show by clear and convincing evidence that the name change is necessary to serve the best interest of the child. See *id.*; *Tate Oliver B.*, 2016 IL App (2d) 151136, ¶ 30. Clear and convincing evidence is that quantum of proof that leaves no reasonable doubt in the mind of the fact finder as to the truth of the proposition in question. See *Bazydlo v. Volant*, 164 Ill. 2d 207, 213 (1995). The fact that the name-change statute requires proof by clear and convincing evidence is a further indication that a child's name may not be changed unless the evidence unmistakably shows that the name change is necessary to serve the minor's best interest. See *Tate Oliver B.*, 2016 IL App (2d) 151136, ¶ 35. Although section 21-101 lists four factors that the trial court must consider in ruling upon a name-change petition, the trial court is not required to explicitly address each of those factors or the evidence that it found compelling. *Id.* ¶ 33. Rather, the record need only reflect that the trial court considered evidence of the statutory factors in making its decision. *Id.*

¶ 35    In the present case, after having reviewed the record, we find that the trial court erred in denying the name-change petition. Contrary to the trial court's ruling, nearly all of the evidence presented at the hearing supported granting the petition. The minor (M.E.), her mother (Julie), and her stepfather (Gary) all wanted the minor's last name to be changed to that of the stepfather. Julie and Gary were providing for all of M.E.'s daily needs. M.E. loved Gary and considered Gary to be her true father. M.E. had been using Gary's last name in nearly all respects for the past several years and was known by that name to her friends, in school, and to the community.

- 16 -

M.E. was well-bonded with current family and had no connection to Gerald's (her biological father) extended family. Although some of that lack of connection with Gerald's family was arguably due, in part, to decisions that Julie had made, Julie was forced into that position by Gerald's conduct. Gerald had committed a terrible offense that involved both Julie and M.E. and had been in prison since M.E. was 3½ years old. Although Gerald was M.E.'s biological father, for the past several years while he was in prison, he had only attempted contact with M.E. sporadically and was not scheduled to be released from prison until well into M.E.'s adult life. By all accounts, M.E. was doing very well in her current situation. She was happy, was well-adjusted to her home and community, and did very well in school. It is clearly apparent from the record that all of the statutory factors weighed in favor of granting the name-change petition. All of the facts and circumstances in the present case unmistakably indicate by clear and convincing evidence that the name change is necessary to serve the minor's best interest. We find, therefore, that the trial court's ruling to the contrary was against the manifest weight of the evidence. See *Best*, 223 Ill. 2d at 350; *Meyers*, 374 Ill. App. 3d at 449.

¶ 36                                  CONCLUSION

¶ 37        For the foregoing reasons, we reverse the trial court's judgment and remand this case to the trial court with directions to grant the name-change petition.

¶ 38        Reversed and remanded with directions.

- 17 -