# IN THE COURT OF APPEALS OF IOWA

No. 18-1790
Filed June 5, 2019

**BENJAMIN JOHN JASS,**
    Plaintiff-Appellant,

**vs.**

**CARRIE MARIE ATKINSON n/k/a CARRIE MARIE VAN HUGTEN,**
    Defendant-Appellee.
_____

Appeal from the Iowa District Court for Hardin County, James C. Ellefson, Judge.

A father challenges surname, visitation, transportation, child support, and tax credit issues in a decree issued under Iowa Code section 600B.40 (2017). **AFFIRMED AS MODIFIED.**

Christy R. Liss and Joshua L. Christensen of Clark, Butler, Walsh & Hamann, Waterloo, for appellant.

Reyne L. See of Peglow, O'Hare & See, P.L.C., Marshalltown, for appellee.

Considered by Potterfield, P.J., and Tabor and Bower, JJ.

**TABOR, Judge.**

A few days before his son, J.C.,[1] was born, Benjamin Jass petitioned to establish paternity, custody, visitation, and child support under Iowa Code section 610B.40 (2017). The district court issued a decree granting joint legal custody and placing physical care with the child's mother, Carrie Van Hugten.[2] On appeal, Benjamin does not challenge the physical-care arrangement. Instead, he seeks a change in the child's surname, expanded visitation, shared transportation, decreased child support, and alternating tax benefits.

Because our de novo review leads us to the same conclusions as the district court's thorough and well-reasoned decree, we affirm—with a minor modification to the duration of the child-care expense variance from the support guidelines. On the issue of attorney fees, we find no abuse of discretion in the district court's award of $12,500 toward Carrie's trial representation, but we decline to award appellate attorney fees on top of that amount.

## I.     Facts and Prior Proceedings

Carrie and Benjamin met on Match.com in October 2016 and dated for about five months. They broke up a few days before Carrie learned she was pregnant. J.C. was born in October 2017. Because paternity had not yet been established, Carrie did not list a father on the birth certificate. She also gave the child the surname Van Hugten. Carrie is an active-duty major in the United States Marine Corps, earning $123,836 per year, plus sustenance and housing stipends.

---

[1] We use the child's first two initials for clarity's sake when we reach the surname issue.
[2] Carrie is still known professionally by the surname Atkinson, though she legally changed her last name to Van Hugten in September 2017.

Based on a service-limitation rule, she must retire from the Marines on April 1, 2020.

From 2014 through 2016, Carrie was married to Leon Van Hugten, a member of the Dutch Army.[3] She and Van Hugten, who still lives in the Netherlands, had three children together—twins born in 2015 and a daughter born in 2016. The twins arrived prematurely; one died in the hospital and the other has special health issues. Those children all have the surname Van Hugten. Carrie and the children live in Newton.

Benjamin had also been married; his wife died of cancer in August 2016. They had two sons, who were aged five and nine at the time of the hearing in this case. Benjamin remarried in June 2018 to Kathryn, whom he met in the summer of 2017 on a "Facebook widow group." Kathryn brought two daughters, ages ten and thirteen, to the Jass household. Benjamin works as a special education teacher in the Iowa Falls-Alden school district, earning $63,282 per year. He also earns an additional $2249 a year from coaching tennis and $6073 from the farm he operates with his father.

In early October 2017, Benjamin filed a petition requesting DNA testing to confirm his paternity of the baby Carrie expected to deliver by a scheduled caesarean section in mid-October. The petition also asked the court to determine his rights and obligations including joint custody, physical care, child support, and tax dependency exemptions. The district court heard testimony on Benjamin's petition in August 2018.

---

[3] Carrie's first marriage was to Steve Atkinson and lasted from 2009 until 2014. They had no children together.

The October 2018 decree granted the parents joint custody of J.C. and placed physical care with Carrie. The decree allowed Benjamin visitation every other weekend during the school year and three weeks of interaction in the summer, as well as certain holidays. The court required Benjamin to provide all transportation for visitations but offset his child support for that burden. And the court ordered Benjamin to pay $688.11 in monthly child support (which included an upward departure from the child support guidelines for child-care expenses) and an additional $26.95 per month in back child support. The court decided Carrie would be entitled to claim the child as a dependent on her taxes every year. The court denied Benjamin's request the child's surname be changed to Jass or hyphenated as Van Hugten-Jass. Instead, the court directed Jass be added to the birth certificate as the child's second middle name. Finally, the court awarded trial attorney fees to Carrie in the amount of $12,500.

Benjamin's appeal spans six topics: (1) his son's surname, (2) visitation, (3) transportation, (4) child support, (5) tax benefits, and (6) attorney fees.

## II. Scope and Standards of Review

We engage in a de novo review of equitable disputes involving a child's surname. *Montgomery v. Wells*, 708 N.W.2d 704, 705–06 (Iowa Ct. App. 2005). We give weight to the district court's factual findings, especially when considering the credibility of witnesses, but we are not bound by them. *Id.*

We also review de novo issues involving visitation. *Callender v. Skiles*, 623 N.W.2d 852, 854 (Iowa 2001). Likewise, we review child-support awards anew, *Dye v. Geiger*, 554 N.W.2d 538, 539 (Iowa 1996), though we evaluate the district court's interpretation of the child support guidelines for errors at law. *In re Seay*,

746 N.W.2d 833, 834 (Iowa 2008). We also recognize the discretionary aspect of a district court's decision whether to impose a variance. *In re Marriage of Kupferschmidt*, 705 N.W.2d 327, 334 (Iowa Ct. App. 2005) (holding "district court did not abuse its discretion in refusing to deviate from the guidelines").

By the same token, we review the award of attorney fees for an abuse of discretion. *In re Fiscus*, 819 N.W.2d 420, 422 (Iowa Ct. App. 2012).

## III. Analysis

### A. Surname

In his petition, Benjamin asked the court to order the child be given the surname Jass. On the birth certificate, Carrie recorded her son's name as "[J.C.] Van Hugten." At the hearing, Benjamin said he did not object to his son's first and middle names but believed "my son should have my last name." Benjamin testified he was opposed to "any type of hyphenated name" and expressed incredulity as to why the child "would need to be tied to her ex-husband in any way." Benjamin did not tell the court why it would advantage his son to have Jass as a surname.

Carrie provided more personal testimony concerning her connection to the Van Hugten name. She first noted her twin daughter who died, M.V.H., was buried in the Newton Union Cemetery. Carrie then explained that she "almost died" giving birth to her next daughter, E.V.H. From there, she testified: "I was about ready to have my C-section with [my son] [a]nd so I changed my last name to Van Hugten in anticipation of what could become my death . . . so that I could be buried with my daughter . . . with the last name Van Hugten." Carrie owns a burial plot with a single headstone bearing her deceased daughter's name; she plans to be buried in the same plot under the same last name.

As to their son's surname, Carrie testified her preference would be Van Hugten so he would have the same last name as his half-siblings and not feel like "an outcast in his own home." She continued: "It's the Van Hugten home, and for him to be the Jass boy, and especially if Ben is awarded every other weekend, I don't think that's conducive to elementary school." But Carrie also testified she understood Benjamin's position and was amenable to a dual last name: "like, Van Hugten and then space and then Jass."[4]

The district court admittedly elected "an option not proposed by either party." The court decided the child "should have Jass as an additional middle name" creating the full name [J.C.] Jass Van Hugten. The court reasoned: "Many families have used as a middle name a historic family surname that might otherwise be lost, to help a child maintain awareness of his or her heritage."[5]

On appeal, Benjamin renews his request for the surname substitution. But in addition, he now lobbies for the compromise position of assigning his son the hyphenated surname Van Hugten-Jass or the unhyphenated, but dual surname Van Hugten Jass.

In original naming disputes, we focus on the best interests of the child.[6] *Montgomery*, 708 N.W.2d at 706–08. Our courts have abandoned the outdated

---

[4] Carrie also testified she spoke "with the Iowa Department of Vital Statistics, they're, like, do not use a hyphen. It causes problems in their computer system." But that second-hand information was not verified by any official testimony or documents.

[5] Scholarly literature backs the district court's point. In *The Means of Naming: A Social and Cultural History*, author Stephen Wilson noted middle names are a way to keep family names going and preserve relationships. Stephen Wilson, *The Means of Naming* 300 (1998).

[6] Name change cases are governed by Iowa Code section 674.6, which carries a different standard. *See, e.g.*, *Braunschweig v. Fahrenkrog*, 773 N.W.2d 888, 895 (Iowa 2009); *Peckosh v. Wenger*, No. 11-0119, 2011 WL 4578532, at *4 (Iowa Ct. App. Oct. 5, 2011). Here, Carrie bestowed J.C.'s surname by unilateral action on the birth certificate.

notion that a child should always bear the last name of his or her father. *Id.* (quoting *In re Marriage of Gulsvig*, 498 N.W .2d 725, 729 (Iowa 1993)). On the flipside, a mother "should gain no advantage from her unilateral act in naming [the child]." *Id.* Combining both parents' last names into a dual surname may be an equitable solution in some circumstances, but not in every case. *Gulsvig*, 498 N.W. 2d at 729; *see* Richard J. Lussier, Delaney v. Appeal from Probate*: When is a Dual Surname in the Best Interest of the Child?*, 9 Conn. Prob. L.J. 161, 167 (1994) ("Adoption of a dual surname is not always in the best interest of the minor child.").

In typical appellate court style, we weigh a non-exhaustive, yet lengthy, list of considerations in gauging a child's best interest in a naming dispute. In *Montgomery*, we compiled these factors:

> (1) Convenience for the child to have the same name as or a different name from the custodial parent.
> (2) Identification of the child as part of a family unit.
> (3) Assurances by the mother that she would not change her name if she married or remarried if the child maintains the mother's surname.
> (4) Avoiding embarrassment, inconvenience, or confusion for the custodial parent or the child.
> (5) The length of time the surname has been used.
> (6) Parental misconduct, such as support or nonsupport or maintaining or failing to maintain contact with the child.
> (7) The degree of community respect associated with the present or changed name.
> (8) A positive or adverse effect a name change may have on the bond between the child and either parent or the parents' families
> (9) Any delay in requesting or objecting to name change.
> (10) The preference of the child if the child is of sufficient maturity to express a meaningful preference.
> (11) Motivation of the parent seeking the change as an attempt to alienate the child from the other parent.

---

Therefore, Benjamin is not asking to *change* J.C.'s surname but challenges the initial determination of the name Carrie chose to record. *See Montgomery*, 708 N.W.2d at 706.

*Montgomery*, 708 N.W.2d at 708–09 (internal citations omitted).

The first through fourth factors favor Carrie's position. She persuasively articulated at trial that she believed J.C. would benefit from the sense of belonging that accompanied being part of a sibling unit with the same last name. As the district court found, whether or not she remarries, Carrie intended "to die with the name of Van Hugten" so she could share a headstone with her infant daughter. As the custodial parent, it will be more convenient and less confusing for Carrie to have all three of her children share the Van Hugten name. As to the fifth factor, while Carrie herself has not used the surname Van Hugten for long, we defer to the district court's finding: "[T]he history of her name is unusual, but this court finds her explanation to be entirely credible."

On factors six and seven, no parental misconduct is at issue, but Benjamin presented no evidence on "the degree of community respect" associated with the Jass name. While bemoaning the lack of "direct evidence on this point," the district court ventured: "There is no reason in this record to doubt that the Jass family is respected in the Alden-Iowa Falls area. There is no reason in the record to think the Jass name is known at all in Newton." On appeal, Benjamin addresses the eighth factor by asserting J.C. would have a "stronger connection" with him and the extended Jass family if he shared their name. But Benjamin again presented no testimony in support of that claim at trial.

On the final pertinent factor,[7] neither Carrie nor Benjamin appear motivated to alienate the child from the other parent. But Carrie voiced a more flexible

---

[7] Factors nine and ten have no bearing in this case.

position at trial on the naming issue. The record also shows Carrie has been supportive of Benjamin's relationship with J.C. That showing differentiates this case from *Rapp v. Abraham*, No. 06-0451, 2007 WL 1687772, at *2 (Iowa Ct. App. June 13, 2007), upon which Benjamin relies. Here, it is not necessary for J.C. to have the Jass surname to ensure a connection to his father's family.

We also find this case distinct from *In re Uker*, No. 10-1829, 2011 WL 2420702, at *2 (Iowa Ct. App. June 14, 2011), where the noncustodial father sought to hyphenate his daughter's name on the birth certificate and presented evidence concerning why the combined name was in the child's best interests. Here, Benjamin objected to hyphenation at trial, yet urges a hyphenated last name as an alternative on appeal. Because the district did not have the benefit of Benjamin's current position, we do not consider it on appeal. *See State v. Rutledge*, 600 N.W.2d 324, 325 (Iowa 1999) ("Nothing is more basic in the law of appeal and error than the axiom that a party cannot sing a song to us [on appeal] that was not first sung in the trial court.").

Without any analysis or authority, Benjamin asserts the addition of a second middle name "does little to help [J.C.] identify with the Jass family," whereas establishing Jass as a second surname would be in the child's best interests. Benjamin does not flesh out this dichotomy, and we are not persuaded by his bare assertion. Our own research reveals courts have long debated the legal import of middle names.

> It was an ancient rule that the law would recognize but two names of an individual, the surname and one given name, and that anything more would be disregarded as of no significance. Generally the first name was the one recognized, and a middle name or its initial was treated as a negligible incident.

*Loser v. Plainfield Sav. Bank*, 128 N.W. 1101, 1104 (Iowa 1910). But even in 1910, the supreme court observed that middle names could be an important part of a person's identity:

> [T[he average person is no longer started in life with a single given name, but usually with two or more. In familiar address he is ordinarily called by one only, and if he writes either of his Christian names[8] in full, it is the one by which he is best known. This familiar name may be, and perhaps more often is, the first, but it is not so universally the case that the habitual and common use of the second name may be ignored. He who is christened "James Monroe" or "John Wesley" or "Benjamin Franklin" may be known to his friends, acquaintances, and the community in which he lives simply as "Monroe" or "Wesley" or "Franklin[.]"

*Id.* at 1104.

Like the district court, we find incorporating Jass as a second middle name was in J.C.'s best interests because the addition adequately fostered an ongoing awareness of his ties to Benjamin's family. Courts from other jurisdictions have reached similar conclusions when deciding what name is in a child's best interests. *See, e.g.*, *In re Marriage of McManamy & Templeton*, 18 Cal. Rptr. 2d 216, 218 (Ct. App. 1993) (declining father's proposed name change when daughter already had his surname as middle name and he simply voiced his unhappiness with the mother's choice of surname for the child); *In re Tate Oliver B.*, 52 N.E.3d 351, 362 (Ill. App. Ct. 2016) ("Given that the evidence did not support a finding that a name change was necessary to serve Tate's best interest, the trial court potentially could have advanced the goal of including both parents' surnames by adding Evan's

---

[8] "In medieval England, the *Christian name* was the baptismal name and was the only name most people bore. Surnames were given to differentiate (e.g., Robert the Younger)." Bryan A. Garner, *Modern American Usage* 790 (3d ed. 2009).

surname as an additional middle name."); *Swadner v. Swadner*, 897 N.E.2d 966, 972 n.3 (Ind. Ct. App. 2008) ("Although not customary, it is not uncommon for individuals to bear two middle names."); *M.D. v. A.S.L.*, 646 A.2d 543, 546 (N.J. Super. Ch. Div. 1994) ("The child's middle name shall be changed to include the father's surname if that is [the father's] desire. Anything that can reinforce the bonds between the child and her individual parents is to be encouraged, provided that the focus is through the eyes and needs of the child."). We decline to modify the decree on the naming issue.

## B. Visitation

We turn next to Benjamin's challenge to the visitation schedule. Decrees should award a noncustodial parent with liberal visitation so a child will have the chance for maximum continuing physical and emotional contact with both parents. *In re Marriage of Farrell*, 481 N.W.2d 528, 531 (Iowa Ct. App. 1991). Like physical care, the visitation arrangement must serve the child's best interests. *Id.*

The decree allowed Benjamin to have care of J.C. every other weekend from 5:00 p.m. on Friday through 5:00 p.m. on Sunday, "continuing the established pattern of alternation." The decree also allowed Benjamin "extended summer visitation of one week (that is seven days including any adjacent or included visitation weekend) in each of the months of June, July, and August." And the decree allotted holiday time between the parents.

On appeal, Benjamin complains he received "limited visitation" in the decree. Carrie hops on that word choice, insisting the schedule is "common for non-custodial parents, particularly those who live some distance from the child." (Her home in Newton was about seventy-five miles from Benjamin's acreage

outside of Alden.) Benjamin contends he should have more time with J.C. in June, July, and August because he does not teach classes during the summer. He proposes J.C. live with him in the summer and Carrie receive the alternating weekend visitation Benjamin was assigned during the school year. Benjamin also proposes receiving more visitation time during the school year, either nine or fourteen overnights per month.

In response, Carrie points out Benjamin did not propose a specific visitation schedule at trial, but rather talked generally about maximizing contact. She argues it is not in J.C.'s best interests to be in his father's care for the entire summer. She expresses concern Benjamin's other time commitments (for example, coaching and farming with his father) would prevent him from directly supervising J.C. and the child would often be cared for by extended family members. Carrie argues the current visitation schedule "works well with the routines of both households."

After our independent review, we find no reason to change the visitation order. The current schedule—alternating weekends during the school year and an extra week of visitation in each month of the summer—provides J.C. significant ongoing contact with his father. Allowing Benjamin visitation for the entire summer would not be in the child's best interests. It would deprive J.C. of maximum contact with the parent awarded physical care and would limit his ability to participate in activities in his home community as he approaches school age. We affirm the visitation provisions of the decree.

### C. Transportation

On a related note, Benjamin argues the district court failed to achieve equity by requiring him to provide all transportation to effectuate visitation. At the time of

trial, Benjamin had been transporting J.C. at both the beginning and end of every visitation and asked that the burden be shared equally. Carrie resisted, testifying to the difficulty of traveling with "a disabled three-year-old, a two-year-old and an infant, three car seats, it's a lot of logistics."

The district court carefully analyzed the situation:

> [I]f she is required to provide transportation, she would be required to transport three children one way and two the other. The oldest will be four in January of 2019 and has significant health issues. Requiring her to provide transportation on the current schedule would require her to be on the road at the children's evening meal time.
> The court will not order Ms. Van Hugten to provide part of the transportation. Splitting the trips, each party going halfway, means that the party who arrives first will be required to wait in a place away from both homes with one or more children in a motor vehicle. That is not in this child's best interest. Neither is it in his best interest to have him on the road at mealtime, to interrupt Mr. Jass's time with the child, or to have the child arrive so late that his bedtime is disrupted; at least one of those events would occur if Ms. Van Hugten is required to provide a round trip. Having Mr. Jass provide all the transportation is not entirely satisfactory, but it is the least unsatisfactory alternative the court has. When the child grows older, time in the car with his father can become meaningful.

But the court also recognized bearing the entire cost of transportation was a substantial injustice to Benjamin. To offset that cost, the court adjusted Benjamin's child support obligation by $185.50 per month. We agree this cost-sharing was an equitable solution to the transportation dilemma. *See In re Marriage of Bonnette*, 492 N.W.2d 717, 722 (Iowa Ct. App.1992).

### D. Child Support Variance

On the issue of child support, Benjamin argues the district court should not have deviated upward from the guidelines to allow a variance for Carrie's child care expenses. Iowa Court Rule 9.11A permits the court to vary the amount of

child support that would result from the application of the guidelines based on the custodial parent's child-care expenses. "In determining whether variance is warranted under this rule and rule 9.11, the court should consider the fact that child care expenses are not specifically included in the economic data used to establish the support amounts in the Schedule of Basic Support Obligations." Iowa Ct. R. 9.11A.

Under Rule 9.11, the court is not to vary from the amount of child support that would result from application of the guidelines without a written finding that the guidelines would be unjust or inappropriate. Two criteria inform that determination: (1) "substantial injustice would result to the payor, payee, or child[]," and (2) "adjustments are necessary to provide for the needs of the child[] or to do justice between the parties, payor, or payee under the special circumstances of the case." Iowa Ct. R. 9.11.

Here, Carrie showed she paid $205 per week[9] (the cost for infants and toddlers) to the Newton YMCA Early Learning Center for J.C.'s care. Because Benjamin's earnings represented about thirty-six percent of the parties' income, the court calculated his monthly share of the child care expenses to be $306.50. The court added that amount to Benjamin's obligation of $547.11, and then subtracted the transportation costs of $185.50, for a total monthly payment of $668.11.

Benjamin complains the court did not make specific findings in support of the variance or justify why the special circumstances of this case required the

---

[9] The court extrapolated a cost of $10,660 per year and $888 per month.

upward deviation from the guidelines. Carrie contends, "Rule 9.11A does not require the trial court to make specific findings that a variance is necessary to prevent substantial injustice or necessary to provide for the needs of the child or to do justice between the parties." We disagree with Carrie's interpretation of the rule. Rule 9.11A expressly cross references Rule 9.11, which requires written findings to support a variance from the guidelines. When several acts relate to the same subject, we read the challenged language "in pari materia" or in a like manner. *State v. Hensley*, 911 N.W.2d 678, 682 (Iowa 2018) (quoting *State v. Coleman*, 907 N.W.2d 124, 137 (Iowa 2018)). Interpreting rule 9.11A by reference to 9.11, we believe written findings were required.

But in cases where the district court has not made required findings under rule 9.11, we have done so as part of our de novo review. *See, e.g.*, *In re Marriage of El Krim*, No. 16-1620, 2017 WL 2465806, at *5–6 (Iowa Ct. App. June 7, 2017); *In re Marriage of Lindemier*, No. 14-1321, 2015 WL 2089702, at *6 (Iowa Ct. App. May 6, 2015); *In re Vaske*, No. 08-1922, 2009 WL 3064425, at *2 (Iowa Ct. App. Sept. 17, 2009).

At trial, Carrie touted the high quality of care J.C. would receive at the weekly cost of $205, and Benjamin testified he did not object to J.C.'s attendance at the YMCA center. The only alternative Benjamin suggests is his mother's ability to provide childcare, but this is not consistent with the care arrangement, as she lives in Alden. The district court agreed J.C. "would benefit socially at the Newton YMCA in ways that no in-home caretaker could provide." Carrie also testified she paid $185 per week for her three-year-old daughter to attend the same child-care center. On top of that expense, Carrie's four-year-old daughter requires more

specialized care.  If Carrie was ordered to find a cheaper child care provider, she would have to pick up and drop off at three different locations each day, a time-consuming and logistical hardship.  By contrast, Benjamin did not have the burden of other child-care expenses because his sons were already school aged.  Given these special circumstances, we conclude the adjustment in child support was necessary to achieve substantial justice for Carrie and J.C.  We find it equitable for Benjamin to share in the costs of J.C.'s child care in accord with his income percentage.  Therefore, we affirm the child-care expense variance ordered by the district court.

But, as Benjamin argues, that variance should have an end date.[10]  We modify the decree to add a sunset provision for the upward deviation from the support guidelines.  Carrie testified after her mandatory retirement date in the spring of 2020, she plans to stay home with her children until they reach school age.  Thus, when Carrie stops paying full-time tuition for J.C. to attend daycare, she should notify Benjamin and, in the following month, his child support obligation should return to the amount specified in the guidelines.

### E.  Tax Benefits

Benjamin next contends the district court misallocated the tax benefits relating to J.C.  At trial, counsel for the parties agreed recent federal tax legislation (Pub. L. No. 115-97, 131 Stat. 2054 (2017), dubbed the Tax Cuts and Jobs Act (TCJA) by its sponsors) suspended both personal exemptions and those for

---

[10] Carrie argues Benjamin did not preserve this request for appeal because he did not ask for an end date in the district court.  We conclude our de novo review permits us to reach the end-date issue.  Carrie also argues there is not enough evidence in the record to support a specific end date.  We disagree.

dependents starting in 2018, but increased the child tax credit.[11]  According to the Internal Revenue Service, under the TCJA, a child may be treated as a "qualifying child" of a noncustodial parent if the parents were divorced or living apart for at least six months, the child received half of his support from the parents, the child is in the custody of one or both parents for at least half the year, and the custodial parent signs a waiver form.  *See* IRS Publication 4449 (Rev. 2-2011) (Cat. No. 39718N Department of the Treasury); *see also* IRS Form 8332 (rev. October 2018).  But Carrie's counsel noted under the TCJA, Benjamin could not claim the child-care credit because "the child doesn't reside with him and he's not paying for child care."[12]

> The decree included this discussion:

> The court will assign all tax benefits relating to the child to Ms. Van Hugten as the primary physical care parent.  This is the basis on which the court has calculated support.  After the tax legislation of 2017, the status of the tax benefits is somewhat uncertain until the regulations are promulgated.  Counsel agreed at trial that some benefits are available only to the parent with physical care.  Mr. Jass's obligation is lower because he has not been assigned the benefits, and the court does not want to allow any benefits to be unused.

---

[11] "Though the TCJA eliminated dependency exemptions for tax years 2018 through 2025, the [26 U.S.C.] Sec. 152 definitions of dependents remain relevant for determining eligibility for the child tax credit.  Sec. 24(h)(2) doubles the credit amount from $1,000 to $2,000 per 'qualifying child.'"  Katherine Hetherington, *Child Tax Credit Now Higher, More Widely Available*, J. Acct. (June 1, 2018), https://www.journalofaccountancy.com/issues/2018/jun/child-tax-credit.html (explaining up to $1,400 of the credit can be refundable if the taxpayer is unable to use the credit to offset his or her tax liability).

[12] While counsel did not cite any authority for this proposition, it appears to be accurate under the Internal Revenue Publication for Child and Dependent Care Expenses (for use in preparing 2018 returns) which states: "The noncustodial parent can't treat the child as a qualifying person [for purposes of child-care expenses] even if that parent is entitled to claim the child as a dependent under the special rules for a child of divorced or separated parents."  Internal Revenue Serv., U.S. Dep't of the Treasury, Pub. No. 503, *Child and Dependent Care Expenses* 4 (Jan. 15, 2019).

On appeal, Benjamin claims equity requires he and Carrie alternate the tax benefits related to J.C.  Citing her prior tax filings, Benjamin argues, "Carrie does not need the tax dependency for [J.C.] to avoid taxes, but instead it would simply give her more credits and a larger refund."  Carrie defends the decree and points to the district court's assertion "counsel for the parties *agreed* that some of the benefits of claiming the child are only available to the custodial parent."  She also argues reliance on her past returns is misplaced because her substantial losses from a closed business will not recur, she will have taxable income moving forward, and she will benefit from claiming the child tax credit for J.C.  She contends Benjamin has not offered "evidence of how he would benefit more than Carrie or why the benefits that are only available to Carrie as the custodial parent should be wasted."

The general rule has been "that the parent given physical care of the child is entitled to claim the child as a tax exemption."  *In re Marriage of Okland*, 699 N.W.2d 260, 262 (Iowa 2005) (citing *In re Marriage of Kerber*, 433 N.W.2d 53, 54 (Iowa Ct. App. 1998)).  But "Iowa district courts have the authority to award dependent child tax credits to the noncustodial parent to achieve an equitable resolution in a dissolution."  *In re Marriage of Rolek*, 555 N.W.2d 675, 679 (Iowa 1996).  Courts should consider whether allocating the credits to the noncustodial parent would "free up more money for the dependent's care," or whether it would be inequitable to allocate the exemption to the custodial parent because they would benefit the least from receiving it.  *Okland*, 699 N.W.2d at 260, 269.  Here, Benjamin has not shown an award to him would "free up more money" for J.C.'s

care. On the instant record, we find no inequity in the court's award of the child tax benefits to Carrie.

### F. Attorney Fees

In his final assignment of error, Benjamin argues the district court abused its discretion in awarding Carrie trial attorney fees. The court may award the prevailing party reasonable attorney fees in a proceeding to determine custody or visitation. Iowa Code § 600B.26. Benjamin insists the court overlooked the significant disparity between their incomes and failed to analyze who was the "prevailing party." We disagree on both counts. The district court "clearly had the parties' abilities to pay in mind" when it ordered Benjamin to pay $12,500 of Carrie's $13,763 in trial attorney fees. *See Markey v. Carney*, 705 N.W.2d 13, 26 (Iowa 2005). The court expressly noted Carrie's "greater annual income" but recognized her "significant financial burden arising from the special needs of her older child." The court also considered the greater "liquid assets" available to Benjamin. And Carrie prevailed on the contested issues of physical care and visitation. We find no abuse of discretion in the award of trial attorney fees.

Section 600B.26 also allows the award of appellate attorney fees. *Schaffer v. Frank Moyer Constr. Inc.*, 628 N.W.2d 11, 23 (Iowa 2001) (holding statute allowing award of trial attorney fees permits award of appellate attorney fees as well). We exercise our own discretion in deciding whether to award reasonable fees to the party prevailing on appeal. *Markey*, 705 N.W.2d at 26. Although Carrie prevailed on nearly all issues raised by Benjamin on appeal, we decline to award her appellate attorney fees. The district court ordered Benjamin to pay a significant amount of her trial attorney fees, and we do not believe he is in a financial position

to pay more toward her appellate representation.  But the costs of the appeal are assessed to Benjamin.

**AFFIRMED AS MODIFIED.**